OPINION OF THE COURT
David B. Saxe, J.
In order to avoid awarding contracts to corrupt enterprises, the new New York City Charter gives the City Comptroller the right to object to registration of a contract between the City and a private contractor, and requires the Mayor to review the submitted evidence and uphold or disagree with the objection to the contract. This proceeding clarifies the rights and obligations of the contractor, the Comptroller and the Mayor when such an objection is interposed.
In this CPLR article 78 proceeding, petitioner Dentom Transportation, Inc. (Dentom) seeks an order directing respondents to register and award to Dentom a busing contract for the transport of Human Resources Administration (HRA) *33 employees to and from work. Dentom further seeks to permanently enjoin HRA from rebidding the work and from awarding a contract for this work to any contractor other than petitioner. Petitioner also seeks an order requiring the City to compensate it for work it rendered to respondent under temporary ID No. 1-0636.
In September 1990, Frank Braccia was convicted, as a result of a plea bargain, of the misdemeanor of giving an unlawful gratuity. His conviction was the result of a 1986-1987 investigation in which an undercover police officer posed as a New York State Department of Transportation school bus inspector. Mr. Braccia was named by the undercover officer as one of 41 people representing 55 City school bus companies who offered him a bribe of between $10 to $10,000 in order to overlook violations ranging from faulty breaks and steering columns to minor infractions. Of the 14 buses presented for inspection by Mr. Braccia, five were owned by Dentom.
In January 1991, Dentom submitted a bid in the amount of $363,042 for transportation services to HRA over a two-year period. On March 4, 1991, Dentom was informed in writing by HRA that it had submitted the low bid on the contract. This letter further stated that the contract had to be registered and certified with the Office of the Comptroller prior to the commencement of its terms. Dentom began providing shuttle service to HRA in March 1991, even though the contract had not yet been registered.
This new requirement for registration of the contract with the Office of the Comptroller was pursuant to a new provision, section 328 of the New York City Charter adopted November 1989. The provision empowers the Comptroller to object to the contract’s registration within 30 days of the filing of the contract, on the basis of "possible corruption in the letting of the contract or that the proposed contractor is involved in corrupt activity.” The Mayor must then review the evidence that the Comptroller has submitted and the Comptroller’s basis for any objections, and can either uphold or disagree with the objection.
On June 21, 1991, the contract was delivered to the Comptroller for registration. Pursuant to the newly provided power in the 1989 Charter, respondent Holtzman, in her capacity as Comptroller of the City of New York, initiated an investigation.
She interviewed the principal of Dentom, Ms. Lia, and *34 elicited several sworn statements. In a statement sworn to on July 8, 1991, Ms. Lia stated, "Frank Braccia was never and is not now associated with Dentom in any official capacity (whether as a manager, an employee, or a full or partial owner). His sole relationship with Dentom consisted of occasionally driving a bus for the company. He has not driven any buses for Dentom since 1987” (emphasis added).
Additionally, in an interview conducted by the Comptroller’s staff on July 16, 1991 with the undercover officer who had taken part in the criminal investigation of Mr. Braccia, the undercover officer stated that it was Mr. Braccia who regularly presented Dentom vehicles for inspection and it was Mr. Braccia who frequently signed completed inspection forms prepared by the officer. According to the officer, Frank Braccia brought in Dentom’s vehicles "all the time.” The Comptroller notes that Ms. Lia’s sworn statement of July 18, 1991 that "Frank Braccia’s indictment had nothing to do with Dentom Transportation” is belied by the fact that Mr. Braccia’s conviction was in connection with his presentation of Dentom buses for inspection. Furthermore, the Comptroller posed the following question to Ms. Lia in writing: "Did Mr. Braccia ever take any vehicles owned or operated by Dentom in for inspection and/or was he ever present at any inspections of Dentom buses?” (Emphasis added.) The Comptroller notes that in her sworn statement of July 18, 1991 Ms. Lia did not respond to this question but answered instead by identifying the individual who currently presents Dentom vehicles for inspection. Ms. Lia also affirmatively swore that: "Frank Braccia was never an owner, officer or manager of Dentom * * * In 1989, at the time of his indictment, Frank Braccia was in fact my husband, but he was not an owner, or officer, nor held a managerial position in Dentom Transportation, Inc.” However, this assertion was in contradiction to a file obtained from the Department of General Services (DGS), Division of Real Property, regarding the 1987 sale of 8 Rome Avenue, Staten Island, by New York City to Dentom. Each of the documents in the file was signed by "Francis Braccia” or "Frank Braccia” on behalf of Dentom. Francis Braccia was identified as the president of Dentom on many of these documents.
On July 19, 1991, in a letter to Mayor David Dinkins, the Comptroller objected to the registration of the contract and declined to register it because of the apparent falsity of sworn statements submitted by Ms. Lorraine Lia, Dentom’s president *35 and Frank Braccia’s ex-wife. The Comptroller also objected to the involvement of Mr. Braccia in the affairs of Dentom. According to the Comptroller, "Ms. Lia’s statement that Mr. Braccia’s sole relationship with Dentom consisted of occasionally driving a bus is apparently inaccurate.”
Michael Rogers, the Mayor’s representative, then reviewed the Comptroller’s written objection and attached memorandum and exhibits. During the period of his review, he received the letters from Ms. Lia and held a face-to-face meeting with Ms. Lia at her request in which he questioned her about Mr. Braccia’s relationship with Dentom. Rogers noted that in her July 22, 1991 letter to him, she stated "Francis Braccia has no relationship with Dentom,” yet her earlier July 8, 1991 statement said that Frank Braccia "occasionally” drove Dentom buses.
Although Rogers concluded that there was insufficient evidence as to Ms. Lia’s knowledge of Braccia’s activity in purchasing and selling 8 Rome Avenue on behalf of Dentom (despite the fact that they were married at that time and she was the president of Dentom), Rogers upheld the Comptroller’s objection to registration of the contract. He concluded that Lia had filed and sworn to false statements in her July 8, 1991 statement where she asserted that Frank Braccia was never associated with Dentom.
Petitioner now proceeds under CPLR 7803 (3). In CPLR article 78 proceedings, "The courts cannot interfere unless there is no rational basis for the exercise of discretion or the action complained of is 'arbitrary and capricious’ ” (Matter of Pell v Board of Educ., 34 NY2d 222, 231 [1974]). "Once a rational basis for [an administrative] determination is found to exist, the court’s power to interfere in the award of a contract arising out of the bidding process is ended” (Abco Bus Co. v Macchiarola, 75 AD2d 831, 833 [dissent by Hopkins, J. P.], revd for reasons stated in dissenting opn 52 NY2d 938 [1981]).
Section 103 (1) of the General Municipal Law, which codifies the law for public agencies as to public bidding procedures, provides that: "contracts for public work * * * and all purchase contracts * * * shall be awarded by the appropriate officer, board or agency * * * to the lowest responsible bidder” (emphasis added).
Additionally, Procurement Policy Board Rules (PPBR) § 1-01 (c) (7) (9 RCNY 1-01 [c] [7]), the regulation applicable to New *36 York City Charter § 328, states that: "Information provided by contractors to the City must be complete and accurate.”
Ms. Lia’s failure to respond in her sworn statement to a material question about the activities of Francis Braccia is indicative of nonresponsibility as is her apparently untrue assertion that Mr. Braccia was never associated with Dentom in any way (see, PPBR § 1-01 [c] [7]; Abco Bus Co. v Macchiarola, supra [where the Court noted that the term "responsibility” incorporates a bidder’s integrity, judgment and background]; Arc Plumbing & Heating Corp. v Board of Responsibility, 135 Misc 2d 413 [Sup Ct, NY County 1987] [where the City disqualified the bidder where the sole principal evaded questions relating to an indictment and furnished false and misleading information in its bid application]; see also, Matter of Dairymen’s League Coop. Assn, v Perrini, 54 Misc 2d 400 [Sup Ct, NY County 1967] [where the court held that the City’s denial of contract was plausibly based upon petitioner’s refusal to answer questions which bore on the practices and policies of petitioner]).
Petitioner’s further argument that Ms. Lia and Dentom were not involved in "corrupt practices” as defined by New York City Charter § 328 (c) is also unavailing. The word "corrupt” has been defined as: "[s]polled; tainted; vitiated; depraved; debased; morally degenerate * * * to change ones morals and principles from good to bad” (Black’s Law Dictionary 311 [5th ed 1979]). The minutes of the Charter Revision Commission clearly indicated that Commission members intended to give the Comptroller in a post-Board of Estimate government the power to call into question the integrity of the bidder or the bidding process and at least temporarily to stop registration where it felt the bidder was not responsible (see, Minutes of NY City Charter Revision Commn, May 13, 1989, at 377-400). In applying the words "corrupt activity” to the evidence in this case, the Mayor’s representative was properly applying them in the context of his understanding of General Municipal Law § 103 (1) and the purpose of the Charter provision.
Petitioner next contends that it has been denied equal protection of the law in that certain other contractors were, in the past, permitted by the Board of Education to extend their contracts by stipulating that no indicted employee would be associated with the contractor for five years. The essence of equal protection under the law is that all persons (or in this case corporations) similarly situated are treated alike (see, *37 Matter of Engelsher v Jacobs, 5 NY2d 370 [1959]). When a corporation, by its principal, submits a false sworn statement trying to conceal material facts as to its operations, it is not similarly situated with corporations which admit that they employ persons who have been indicted. Thus, petitioner’s equal protection rights have not been violated.
Dentom’s reliance on procedural due process is also unavailing. Petitioner contends that it has been denied due process under the law because the Comptroller relied on information from an undercover police officer in preparing its report and that petitioner did not have an opportunity to interview this officer or cross-examine the undercover officer at a hearing.
However, there is nothing in New York City Charter § 328 (c), General Municipal Law § 103 (1) or PPBR §§ 5-06 and 5-07 that requires the City to offer the petitioner a hearing as to the Comptroller’s objection. Although the courts have implied the requirement of notice and hearing where the exercise of a statutory power adversely affects property rights and the statute was silent (see, Matter of Hecht v Monaghan, 307 NY 461), the right to bid on a contract is not a property right. "Neither the low bidder nor any other bidder has a vested property interest in a public works contract” (Matter of Conduit & Found. Corp. v Metropolitan Transp. Auth., 66 NY2d 144, 148-149 [1985]).
Since no hearing was required to be granted by statute or by implication, petitioner should not be heard to complain when it was afforded an informal hearing. Here, petitioner had a burden to present evidence of its responsibility and failed to do so (see, Matter of Dellwood Foods v Board of Educ., 97 Misc 2d 751 [Sup Ct, Westchester County 1978]).
Accordingly, that portion of petitioner’s motion seeking an order (a) requiring respondents to register and award the contract to petitioner and (b) directing petitioner to permanently enjoin HRA from rebidding the work and from awarding a contract for this work to any contractor other than petitioner is denied.
That branch of petitioner’s motion seeking compensation to the petitioner for services rendered while awaiting the registration of the contract is denied as well.
By the terms of the contract, New York City Charter § 328 and PPBR § 5-07, no contract shall be effective until it has been filed and registered with the Comptroller. Petitioner was *38 on notice that the contract had to be filed and registered by the Comptroller before it became effective.
Petitioner argues that basic principles of fairness and equity should estop the City from enforcing these rules because Mr. Raymond Frasene of HRA specifically requested that petitioner provide bus service to HRA on a temporary basis. Respondents argue that Mr. Frasene acted without authority.
Contracts entered into in violation of statutorily prescribed means may not be enforced against the public entity (Seif v Long Beach, 286 NY 382, 387 [1941]). There are many cases in support of the proposition that there can be no recovery on an unauthorized contract (see, Jered Contr. Corp. v New York City Tr. Auth., 22 NY2d 187 [1968]; Steiner Egg Noodle Co. v City of New York, 34 AD2d 892 [1st Dept 1970]). This doctrine applies even where the public entity has in fact benefitted from the contract (Seif v Long Beach, supra).
Case law and authority cited by petitioner are not on point. Matter of 1555 Boston Rd. Corp. v Finance Adm’r of City of N. Y. (61 AD2d 187 [2d Dept 1978]) and Robinson v City of New York (24 AD2d 260 [1st Dept 1965]) have nothing to do with contracts; Eden v Board of Trustees (49 AD2d 277 [2d Dept 1975]) was concerned with the extraordinary situation which the Court said was unlikely to recur, and must therefore be limited to its facts. In this case, unlike the situation in Eden, making payments in a contract that has not been registered in accord with established procedures and contract terms would have significant impact on the system of controls that the Charter and PPBR have established to weed out nonresponsible bidders as well as ensure financial controls.
Accordingly, petitioner’s application for compensation is also denied.