OPINION OF THE COURT
Michael D. Stallman, J.
Plaintiff Mayor moves for summary judgment declaring invalid Local Law No. 20 of 2001 of the City of New York (adding Administrative Code of City of NY § 6-124) and permanently enjoining its implementation. Defendant City Council cross-moves for summary judgment dismissing the Mayor’s complaint.
Background
Local Law 20 seeks to prevent the City from purchasing uniforms manufactured in sweatshops, either in New York, or in other states or countries. To that end, Local Law 20 bars the City’s contracting agencies from purchasing apparel or textiles from any entity other than a “responsible manufacturer.”
Local Law 20, § 2, defines a “responsible manufacturer” as one which “shall pay a non-poverty wage . . . and shall not contract with any subcontractor operating in violation of any provision of this section.” It defines “non-poverty wage” as “the nationwide hourly wage and health benefit level sufficient to raise a family of three out of poverty” and, “in any event, no less than $8.75 an hour, of which $7.50 must be paid in hourly wages.” Employees of contractors or subcontractors outside the United States must be paid “a comparable nationwide wage and benefit level, adjusted to reflect that country’s level of economic development ... in order to raise a family of three out of poverty.” (Id.)
Local Law 20 vests in the Comptroller the obligation to “determine, and, if deemed necessary, annually adjust the precise level of the non-poverty wage,” and the authority to “promulgate such rules as deemed necessary for determining a non-poverty wage.” (Id.)
*535 Local Law 20 requires the Comptroller to collect and maintain data on contracts awarded for purchase of garments and textiles, and to submit yearly reports to the Mayor and the Council. Contractors must provide specified documentation for compliance monitoring. When presented with information indicating that a contractor or subcontractor is violating the law, the Comptroller must review such information, offer the contractor or subcontractor an opportunity to respond, and determine whether there was a violation. Upon finding a violation, the Comptroller must present evidence of the violation to the contracting agency, which then “shall [have] the duty ... to take such action as may be appropriate and provided for by law, rule or contract.” (Id. [emphasis added].)
The Council enacted Local Law 20 by voting to override a mayoral veto. The Council did not place it on the ballot for a referendum of the City’s voters.
The Mayor contends that Local Law 20 curtails the executive and discretionary powers of the Mayor’s office, while enlarging the powers of the Comptroller, thereby violating applicable referendum requirements of Municipal Home Rule Law § 23 (2) (f) and New York City Charter § 38. The Mayor asserts that Local Law 20 violates the competitive bidding requirements of General Municipal Law § 103, and conflicts with State Finance Law § 162. The Mayor alleges that numerous federal statutes, including the National Labor Relations Act, preempt Local Law 20. He also asserts that Local Law 20 impermissibly intrudes on the exclusive federal power to formulate foreign policy. Finally, the Mayor contends that certain requirements of Local Law 20 are unconstitutionally vague.
I
Using identical language, state law and the New York City Charter require a vote of the electorate to approve any alteration of the City Charter’s mandated separation of powers.
Municipal Home Rule Law § 23 (2) provides that:
“Except as otherwise provided by or under authority of a state statute, a local law shall be subject to mandatory referendum if it: . . .
“f. Abolishes, transfers or curtails any power of an elective officer.”
New York City Charter § 38 (5) requires that a local law be submitted for a referendum if it “[a]bolishes, transfers or curtails any power of an elective officer.”
*536 The Mayor is the City’s chief executive. The implementation of law, and the making of particular determinations necessary for its implementation, is an essential executive function.
Under the City Charter’s mandated separation of powers, the Mayor’s authority over the award of City contracts (see City Charter § 335) is “almost exclusive.” (Matter of Fields v Giuliani, 2001 NY Slip Op 40444[U], *12 [Sup Ct, NY County 2001, Figueroa, J.] [warning that, under petitioner’s construction of City Charter § 334 (6), “all city elected officials, including the fifty-one City Council members, five Borough Presidents, the Public Advocate and the Comptroller (would be able) to insert themselves into the bid solicitation process”]; see also Matter of Giuliani v Hevesi, 276 AD2d 398 [1st Dept 2000] [Comptroller may object to contract on ground of suspected corruption, but, pursuant to City Charter § 328 (c), Comptroller must register contract if Mayor disagrees with Comptroller’s objection].) City Charter § 335 inter alia vests in the Mayor the power to “evaluate the integrity, performance, and capability of entities that contract with the city[, and such] . . . evaluations . . . may include conclusions regarding whether the entity should be considered a responsible contractor.”
A grant of duties to one official need not curtail the powers of another. However, an elected official may not be required to share his or her statutory power with other officials. (See Mayor of City of N.Y. v Council of City ofN.Y., 235 AD2d 230 [1st Dept 1997].)
The Council argues that Local Law 20 does not increase the powers of the Comptroller at the expense of the Mayor, because the Comptroller already has the power to “audit and investigate all matters relating to or affecting the finances of the city, including without limitation the performance of contracts.” (City Charter § 93 [b].) However, nothing in the City Charter vests the Comptroller with the power to determine the terms and conditions for bids or the qualifications of bidders. Nothing in the City Charter permits the Comptroller to direct a contracting agency to take action as contemplated by Local Law 20. Inter alia, by granting the Comptroller the power to determine what constitutes the “non-poverty wage,” both in the United States and in any other country in which apparel and textiles are manufactured for sale to the City, Local Law 20 effectively *537 grants the Comptroller the power to set terms of city contracts, and to determine with whom the City may not contract.*
Local Law 20 adopts a different definition of “responsible” from that intended by the City Charter and generally accepted in municipal contract law. (See, e.g., Abco Bus Co. v Macchiarola, 52 NY2d 938 [1981], revg 75 AD2d 831, 833 [1980], for reasons cited in Hopkins, J.’s dissent [“municipal agency charged with the (contracting) function is rightfully concerned with the bidder’s responsibility — an elastic word which includes considerations of skill, judgment and integrity”].) By effectively adopting the Council’s definition of “responsible,” by giving enforcement powers to the Comptroller and by mandating that mayoral agencies obey the Comptroller’s determinations, Local Law 20 impermissibly encroaches on the Mayor’s function and the discretion of the agencies vested with the duty to determine whether a bidder is responsible.
The City Charter, adopted by referendum, defines the powers of the Mayor, Council and Comptroller; it grants the Mayor nearly exclusive contracting powers. Local Law 20, adopted by ordinary legislative enactment, limits the Mayor’s powers over the municipal contracting process by redefinition and reallocation to the Council and the Comptroller. Local Law 20 disturbs the Charter’s separation of powers. Such enactment constitutes a curtailment and transfer. Without a referendum of the City’s voters, it violates state law and the City Charter. (Municipal Home Rule Law § 23 [2] [f|; City Charter § 38 [5].)
II
State Finance Law § 162 (4-a) (as added by L 2002, ch 350), entitled “Priority in purchasing requirements for apparel or textiles,” imposes certain conditions on prospective vendors for participating in state contracts. Bid specifications for such purchases
“shall include a statement that a state agency shall not enter into a contract to purchase . . . any apparel from a bidder unable or unwilling to provide documentation as part of its bid:
“(A) attesting that such apparel was manufactured in compliance with all applicable labor and oc *538 cupational safety laws, including, but not limited to, child labor laws, wage and hour laws and workplace safety laws;
“(B) stating, if known, the name and address of each subcontractor to be utilized; and “(C) stating, if known, all manufacturing plants utilized by the bidder or subcontractor.” (State Finance Law § 162 [4-a] [c] [i].)
Subdivision (4-a) (b) provides that “[notwithstanding anything to the contrary, political subdivisions may adopt and apply the priority established herein by specifically including the provisions of this subdivision in their bid specifications.” Section 162 (9) provides that “[t]he provisions of this section shall supersede inconsistent provisions of any . . . local law, or the provisions of any charter.”
The Legislature noted:
“Many consumers have legitimately revised their own purchase decisions in the face of revelations about sweatshop labor and conditions. The city of New York has recently enacted legislation to ensure that the labor standards utilized in the manufacture of its apparel are decent and just. It is therefore incumbent that the state exercise appropriate awareness regarding the working conditions in which its extensive apparel purchases are made . . .
It is the intent and purpose of this legislation to ensure that through its market participation, the state continues to uplift economic standards of the workforce.” (L 2002, ch 350, § 2.)
Given the reference to Local Law 20 in the subsequent state enactment, the Council argues that the Legislature did not intend to preempt Local Law 20.
Nevertheless, close contextual analysis of the entire statute shows that the Legislature effected a preemption of the apparel procurement field. The above-quoted language evidences the Legislature’s awareness of Local Law 20 and the Council’s motivation. Yet, with full knowledge of Local Law 20, the Legislature did not address only the State’s participation in the garment and textile market, as it might have. Neither did it validate existing local legislation, e.g., Local Law 20, as it might have. Rather, it addressed the market participation of political subdivisions, providing that such subdivisions could adopt the State’s requirements in their own bid specifications for the *539 purchase of garments or textiles. The State thereby occupied the field and preempted local legislation. By adopting a local opt-in procedure, the State “evinced an unmistakable desire to avoid the possibility that . . . local legislation [would] not be on all fours with that of the State.” (People v New York Trap Rock Corp., 57 NY2d 371, 378 [1982].) “Where the State has preempted the field, a local law regulating the same subject matter is deemed inconsistent with the State’s transcendent interest, whether or not the terms of the local law actually conflict with a State-wide statute.” (Albany Area Bldrs. Assn, v Town of Guilderland, 74 NY2d 372, 377 [1989].) In contrast to state statutes that occupy a field by virtue of the breadth and comprehensiveness of their regulation, State Finance Law § 162 (4-a) occupies the field by giving political subdivisions a choice: to adopt the State’s requirements as their own, or by not adopting them, to have none. It leaves no room for alternative requirements in local bid specifications.
The superceding clause (State Finance Law § 162 [9]) further emphasizes the preemptive role of the local option provision (State Finance Law § 162 [4-a]). Had the Legislature not intended the local option provision to preempt local variation, the Legislature would not have explicitly provided that the state law supercede inconsistent local law. Indeed, without preemption, the local option clause itself would have been surplusage: subdivisions would have been free to adopt the State’s requirements as their own; indeed, they would have been free to incorporate by reference any state law provision. Only by reading these two state provisions in pari materia do they each have meaning; that meaning is preemption. The Legislature knew well that State Finance Law § 162 imposes different requirements on bidders than Local Law 20. Accordingly, State Finance Law § 162 preempts Local Law 20.
Conclusion
Local Law 20 violates the referendum requirement of Municipal Home Rule Law § 23 (2) (f) and City Charter § 38. State Finance Law § 162 preempts Local Law 20. Accordingly, the court need not here address the Mayor’s other objections.
New York has long recognized that sweatshops and other oppressive working conditions are incompatible with a humane and healthy society. Fair labor standards remain an important, continuing goal. However, that end does not justify an impermissible means.
*540 Accordingly, it is hereby adjudged and declared that section 6-124 of the Administrative Code of the City of New York is null and void; its enforcement is permanently enjoined.

 Although the Comptroller does play an important role in enforcing the prevailing wage law in New York City, the Comptroller’s powers relating to the prevailing wage law were independently granted by state law. (Labor Law § 220.)