■ In the Matter of ROBERT I. TOUSSIE et al., Appellants, v COUNTY OF SUFFOLK, Respondent. [809 NYS2d 573]—

In a hybrid proceeding pursuant to CPLR article 78 to review a determination made by the Ways & Means Committee of the Suffolk County Legislature on December 9, 2002 which disapproved an introductory resolution authorizing the execution and delivery of the deeds for 15 parcels of surplus real property that the petitioners purportedly acquired as the highest bidders at an auction conducted by the County of Suffolk on May 16, 2002 and a subsequent determination made by the Suffolk County Legislature that an introductory omnibus resolution authorizing the execution and delivery of the deeds to all of the successful bidders at the same auction be "stricken," and an action pursuant to CPLR 3001 for a judgment declaring that the petitioners are entitled to delivery of the 15 deeds, the petitioners appeal, as limited by their brief, from so much of a judgment of the Supreme Court, Suffolk County (Baisley, Jr., J.), entered December 15, 2003, as dismissed the proceeding and the action.

Ordered that the judgment is modified by adding a provision thereto declaring that the petitioners are not entitled to delivery of the 15 deeds for the surplus real property that they purportedly acquired as the highest bidders at an auction conducted by the County of Suffolk on May 16, 2002; as so modified, the judgment is affirmed insofar as appealed from, with costs to the respondent.

Section A14-30 (I) of the Suffolk County Administrative Code

(hereinafter the Code provision) provides that the execution and delivery of a deed for surplus real property offered for sale at a public auction is subject to the "express approval" of the Suffolk County Legislature. In addition, paragraph 18 of the terms and conditions of sale set forth in the auction brochure, which was distributed to each prospective bidder, unambiguously states that the sale is "conditioned upon, and subject to the approval of the Suffolk County Legislature." Moreover, at the auction, each successful bidder executed a memorandum of sale and received a receipt for its down payment; those documents repeat the caveat that the sales are subject to cancellation pursuant to the terms and conditions of sale. Notably, the Suffolk County Administrative Code and the auction documents do not impose any limits on the Suffolk County Legislature's discretion to approve or disapprove a sale.

Accordingly, the two legislative determinations which, in effect, rejected the petitioners' bids for the 15 parcels of real property, fell within the purview of the cancellation options set forth in the governing statute and auction documents (*see Matter of G.L.G. Mini-Stor. v County of Nassau,* 251 AD2d 329 [1998]; *Trick v County of Westchester,* 216 AD2d 555 [1995]; *Kigler v County of Rockland,* 186 AD2d 787 [1992]). Contrary to the petitioners' contention, the record reveals that the Suffolk County Legislature's refusal to deliver the 15 deeds was rationally based on legitimate concerns about the petitioners' past and present business practices (*see Matter of Mid-State Indus. v City of Cohoes,* 221 AD2d 705 [1995]).

We do not agree with the dissent's position that, merely because there is no need to monitor future performance, the Suffolk County Legislature was prohibited from disapproving the sales based on a concern that the purchasers will convey the properties in question to a related party who has been convicted of a crime. Were the dissent's position correct, i.e., that the Suffolk County Legislature has no authority to disapprove a sale to an otherwise qualified purchaser who has otherwise complied with the contract terms for the sale of surplus property, then the Code provision as well as the express reservation of such authority in the auction brochure would effectively be meaningless and superfluous since the legislature would essentially be limited to judging the ability to perform under the contract, something already covered by the remainder of the bidding and contracting process. The only way to give meaning to this Code provision and the provision in the auction brochure listing this property and conditioning the sales on the County Legislature's approval, which provision is not claimed to be illegal or

improper, is to allow the Suffolk County Legislature to exercise its discretion based on factors other than the buyer's fiscal qualifications, as it has done here.

Neither the cases cited by the dissent nor General Municipal Law § 103 prohibit the action taken by the Suffolk County Legislature. General Municipal Law § 103 is inapplicable as that section regulates purchases and other expenditures by municipalities. In contrast, here we are concerned with the sale by a municipality of surplus property, something not regulated nor even mentioned by that section.

Nor do the cases cited by the dissent require a different result. It is true that in those cases, interpreting the validity of a procurement contract under General Municipal Law § 103 (*e.g., Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.,* 88 NY2d 56, 68 [1996]; *Associated Bldrs. & Contrs. v City of Rochester,* 67 NY2d 854, 856 [1986]; *Matter of Council of City of N.Y. v Bloomberg,* 16 AD3d 212 [2005], *affd* 6 NY3d 380 [2006]), the courts spoke of protection of the public fisc and prevention of, inter alia, favoritism and fraud in the awarding of competitively bid contracts involving the purchase of items by, or the providing of services to, a municipality, as being two permissible objectives of local legislation. However, neither the New York State Legislature, nor the Court of Appeals have extended that same qualification to the conditions that are allowed to be attached to the sale of surplus property by a municipality. In fact, the petitioners have not challenged the validity of the provision, only its exercise against them.

Finally, we note that although a cancellation may seem unfair to a successful bidder, this prospect is one of the clearly stated risks of bidding at a public auction. It was clearly spelled out prior to the bidding and was not a condition which the petitioners challenge as illegal per se (*see L.J.B. Corp. v City of New York,* 182 AD2d 485 [1992]; *Min-Lee Assoc. v City of New York,* 28 AD2d 553 [1967], *affd* 27 NY2d 790 [1970]).

The petitioners' remaining contentions are without merit. Florio, J.P., Schmidt and Santucci, JJ., concur.

Spolzino, J., dissents and votes to reverse the judgment appealed from, on the law, to grant the petition, and to declare that the petitioners are entitled, upon payment of the balance of the purchase price, to delivery of the 15 deeds.

The issue presented by this appeal is whether the County of Suffolk (hereinafter the County) may lawfully refuse to sell surplus property to an otherwise qualified purchaser on the basis of concerns that the purchaser will convey that property

to a related party who has been convicted of a crime involving the use of real property. Because I believe that it is arbitrary and capricious for the County to do so, I dissent, respectfully.

The petitioners are a group of related individuals and business entities who were the successful bidders for 15 parcels of surplus real property sold by the County at auction on May 16, 2002. Not among the group, but at the center of this controversy, is Isaac Toussie, the son of the petitioner Robert Toussie, who pleaded guilty in 2001 to making false statements in applications for federally-guaranteed loans. The County claims that it was justified in refusing to sell property to the petitioners because they may convey that property to Isaac Toussie, who may use it for some nefarious purpose. The County attempts to bolster its action by adding that the petitioner Robert Toussie was, himself, involved in a real-property purchasing scandal with respect to prior sales of County property. The County further alleges, although there is no evidentiary support for the allegation in the record, that there is an ongoing criminal investigation involving Isaac Toussie and all or some of the petitioners.

The County entered into a contract to sell the parcels to the petitioners after the petitioners had been certified as the highest bidders at public auction. The respective obligations of the parties under the contract were simple. Upon the petitioners' tender of the purchase price, the County would convey marketable title to them. Pursuant to its terms, the contract was "binding upon both the Purchaser and the County unless the sale is disapproved by operation of the Suffolk County legislative process." When the Suffolk County Board of Legislators (hereinafter the Board) refused to approve the conveyance of the subject parcels to the petitioners, the County terminated the contract.

The petitioners commenced this hybrid proceeding pursuant to CPLR article 78 challenging the action of the Board and action seeking a declaration of their entitlement to the conveyance. Notably, the petitioners have not brought a cause of action alleging breach of contract, since, as a result of the contract contingency, there is no dispute that the County was within its contractual rights in terminating the contract once the Board refused its approval (*see Orelli v Ambro,* 41 NY2d 952 [1977]; *Matter of G.L.G. Mini-Stor. v County of Nassau,* 251 AD2d 329 [1998]; *Trick v County of Westchester,* 216 AD2d 555 [1995]; *Kigler v County of Rockland,* 186 AD2d 787, 789 [1992]; *Min-Lee Assoc. v City of New York,* 28 AD2d 553 [1967], *affd* 27 NY2d 790 [1970]). Nevertheless, as the County recognizes, the Board's refusal to approve the contract constituted an adminis-

trative act subject to judicial review under an arbitrary and capricious standard (*see Staller v County of Suffolk,* 139 AD2d 726 [1988]).

My colleagues in the majority address this dispute as if it involved a determination with respect to a government procurement contract, as evidenced by the authority upon which they rely (*see Matter of Mid-State Indus. v City of Cohoes,* 221 AD2d 705 [1995]). I agree that in that context, the winning bidder, in order to receive the contract, must also be responsible (*see* General Municipal Law § 103; State Finance Law § 163 [3] [a] [ii]; *Abco Bus Co. v Macchiarola,* 52 NY2d 938, 939 [1981], *revg on basis of dissenting op,* 75 AD2d 831, 833-834 [1980]; *Matter of Mid-State Indus. v City of Cohoes,* 221 AD2d 705 [1995]) and that, as a result, a criminal record, or even a pending criminal investigation, may be a rational basis for the governmental entity to refuse to approve the contract (*see Matter of DeFoe Corp. v New York City Dept. of Transp.,* 87 NY2d 754, 763 [1996]; *Matter of LaCorte Elec. Constr. & Maintenance v County of Rensselaer,* 80 NY2d 232, 238 [1992]; *Matter of Interstate Indus. Corp. v Murphy,* 1 AD3d 751, 752 [2003]; *Matter of N.J.D. Elecs. v New York City Health & Hosps. Corp.,* 205 AD2d 323, 323-324 [1994]; *Matter of Positive Transp. v City of N.Y. Dept. of Transp.,* 183 AD2d 660, 661 [1992]; *Matter of Konski Engrs. v Levitt,* 69 AD2d 940, 942 [1979], *affd* 49 NY2d 850 [1980], *cert denied* 449 US 840 [1980]).

In my view, however, a government sale of surplus real property, the situation presented here, is critically different. Because a contract to purchase goods or obtain services necessarily entails a continuing relationship of performance between the purchaser and the seller to ensure the conformity and delivery of the goods or the full performance of the services, the responsibility of the nongovernmental contracting party is a valid consideration and the governmental contracting entity may reasonably decide that the risk of nonperformance or faulty performance justifies the refusal to enter into such a relationship with a particular party. A contract to sell real property, by contrast, does not present such a risk. Rather, the measure of a purchaser's performance pursuant to such a contract is solely the tender of funds in the appropriate amount at the time appointed for closing. If the purchaser fails to do so, the seller simply refuses to convey title, terminates the contract and, typically, retains the purchaser's downpayment as a measure of damages for the delay and inconvenience it has suffered. There is no need to monitor performance and no continuing relationship whatsoever between the parties.

Although not controlling here, the law of government procurement contracts is relevant in one respect. It is established in that context that a bid condition not rationally related to the purposes of competitive bidding statutes, i.e., obtaining the best price and preventing "favoritism, improvidence, extravagance, fraud and corruption," is invalid (*Matter of New York State Ch., Inc., Associated Gen. Contrs. of Am. v New York State Thruway Auth.*, 88 NY2d 56, 68 [1996]). On this basis, for example, courts have invalidated conditions related to project labor agreements (*id.*), requirements that bidders participate in an apprenticeship program (*see Associated Bldrs. & Contrs. v City of Rochester*, 67 NY2d 854, 856 [1986]) or provide the same benefits to domestic partners as to spouses (*see Matter of Council of City of N.Y. v Bloomberg*, 16 AD3d 212 [2005], *affd* 6 NY3d 380 [2006]), and conditions that the products that are the subject of the contract be made in America (*see American Inst. for Imported Steel v Office of Gen. Servs. of State of N.Y.*, 47 AD3d 118 [1975], *affd* 38 NY2d 991 [1976]) or locally (*see Matter of Warren Bros. Co., Div. of Ashland Oil & Ref. Co. v Craner*, 30 AD2d 437 [1968]). The critical factor in each of these holdings was that the public policy sought to be advanced by the refusal to enter into the contract was not rationally related to the governmental procurement process.

Unlike my colleagues in the majority, I am not willing to hold that the Board may refuse to approve the sale for any reason or no reason. Rather, while I recognize that the issue here is the sale of government property, rather than a government procurement contract, the underlying logic of the procurement cases, requiring a rational basis for government action, is nonetheless applicable.

The Board has defined the purpose of the sale at issue here to be to obtain the greatest financial benefit for the County from its surplus property (*see* Suffolk County Administrative Code § A14-30 [H]). The petitioners' undisputed status as the highest bidders at the auction sale establishes unequivocally that the sale to them will serve that purpose. The considerations upon which the County relies to sustain the Board's refusal to approve the contract are unrelated to the County's stated purpose and are, therefore, not a rational basis for the Board's action. While the Board could rationally have refused to approve the conveyance on the basis of any concern reasonably related to its purpose, such as concerns with respect to the petitioners' ability to perform pursuant to the contract, i.e., to tender the purchase price, no such concerns have been expressed here. In the absence of such concerns, the Board, in my view, acted arbitrarily and capriciously in refusing to approve the contract.

As I see it, the situation presented here is indistinguishable from that considered by the Court of Appeals in *Matter of Ross v Wilson* (308 NY 605 [1955]). The issue in that case was whether a school district could properly decide to sell an unused parcel of property to the party who offered the lower price, because it anticipated that the offeror of the higher price would use the property for a scandalous purpose. Recognizing that such concerns were beyond the authority of the school board whose action was in issue and were, in any event, inconsistent with the purpose of the sale, the court set aside the school board's action, saying: "The higher offer must be accepted if it is for a use that may be conducted pursuant to law. If, as was intimated by the Commissioner of Education, a former school site might be used for a filling station, bar and grill or other enterprise undesired to a specific community, zoning ordinances or other lawful regulatory measures should be adopted" (*Matter of Ross v Wilson, supra* at 611).

The situation here is no different. The petitioners established at the auction that they are the parties willing to pay the highest price for the property. Their money brings the same return to the County as that of any other purchaser. While the Board may be concerned with the uses to which the property may be put once sold, it is the villages and towns within the County, not the County itself, to which such regulatory authority has been delegated by the Legislature (*see* Town Law art 16; Village Law art 7). Moreover, we have long recognized that governmental decisions may not legitimately turn on the number of voices raised in support or in opposition (*see Matter of Bianco Homes v Weiler,* 295 AD2d 505, 506 [2002]; *Matter of Hudson Canyon Constr. v Town of Cortlandt,* 262 AD2d 484, 485 [1999]; *Matter of Necker Pottick, Fox Run Woods Bldrs. Corp. v Duncan,* 251 AD2d 333, 335 [1998]; *Matter of Chernick v McGowan,* 238 AD2d 586, 587 [1997]; *Matter of Marcello v Humenik,* 222 AD2d 677, 678 [1995]), as it appears to me the Board's decision here did. Since the remaining goals that the County seeks to achieve, however laudable they may be, are not related to the purpose that the Board has itself established for this sale, the Board's decision to pursue that purpose by refusing to approve the contract at issue here is, in my view, arbitrary and capricious. I would, therefore, reverse the judgment from which the petitioners appeal, grant the petition, and declare that the petitioners are entitled, upon payment of the balance of the purchase price, to delivery of the deeds to the parcels on which they bid successfully at the May 16, 2002 auction. Accordingly, I dissent.